## LAW OFFICE OF
## ZACHARY S. TAYLOR, ESQ.

305 Broadway, 7th Floor
New York, NY 10007
Tel (212) 257-1900
Fax (646) 808-0966

April 29, 2026

*Via ECF and Email*

The Honorable Carol Bagley Amon
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

**Re:** ***U.S. v. Michail Chkhikvishvili,*** **24-cr-286 (CBA)**

Dear Judge Amon:

I represent Michail Chkhikvishvili as CJA counsel in the above-referenced case and submit this letter in connection with his sentencing, which is scheduled for May 13, 2026 at 10 am.

Michail was only 15 years old when his indoctrination in right-wing extremism began. At that age, his prefrontal cortex, which is responsible for rational decision-making, was not yet developed. He was a small, shy teenager who was suffering from ███████████. For years, Michail had been bullied in school. He had few friends. Girls took no interest in him because he had not reached puberty. Within his teenage social milieu, he was worthless. An alcoholic, his father was incapable of providing helpful guidance. Michail emulated his father's drinking, however, and from the age of 14 or 15 severely abused alcohol to numb his inner turmoil. Michail thought about killing himself. He also fantasized about getting violent revenge on the bullies who tormented him.

When he went online, social media's algorithms led him down dark pathways. Social media is designed to capture and retain users' attention by prioritizing inflammatory content and creating self-reinforcing feedback loops. Online, Michail encountered memes about the March 2019 mosque shootings in Christchurch, New Zealand, which killed 49 people and left dozens more injured. That atrocity resonated in Georgia because the shooter had scrawled the name of a medieval Georgian king onto the magazine of one of his firearms. After Michail clicked on content related to that shooting, the algorithms prioritized related themes. For example, Google recommended to him content about other right-wing extremists, such as Anders Breivik. Michail explored bulletin-board websites like 4chan and 8chan, whose lax moderation makes them a mine for extremist content. Posts on those sites led him to extremist Telegram channels. Guided by algorithms designed

to hold his attention, he fell under the spell of the violent extremist content, which spoke to his own feelings of inadequacy and grievance.[1]

Michail encountered people online, too—not just other teens, but also adults like Igor Krasnov, the founder of the Maniac Murder Cult. They were Michail's audience and provided validation for his celebrations of violence, racism and antisemitism. Around the age of 17, he began making digital artwork on violent themes, which received positive feedback from other extremists online. This "art" brought him to the attention of Krasnov as well as an American Nazi woman five or six years his elder with whom he began a sexual relationship—his first—in the real world. His interactions with these adults normalized for him violence, hate, racism, and antisemitism.

Michail developed a violent extremist persona, Commander Butcher, which not only concealed his true identity but also served as a kind of alter ego. As Commander Butcher, Michail claimed to have committed murder and vicious beatings, which was untrue. He created "art" that celebrated torturing animals, even though in the real world he was exceptionally kind to animals, volunteering at a zoo and purchasing food to feed stray cats and dogs in Tblisi. This is not to say that Commander Butcher was just an act. Michail readily admits that he was genuinely a Nazi, that he hated Muslims and Jews (despite his own partial Jewish descent), and that he wanted to bring about the destruction of Western civilization.

Now, Michail renounces Nazism, antisemitism, racism, and violence. His deprogramming has been a process. The first cracks in the bands of hatred that surrounded his heart appeared during his 11 months of solitary confinement in Moldova's notorious Prison No. 13. Confined alone in a tiny cell 23 hours a day, surviving on rotten food, living amid filth and vermin with a hole in the floor as a

---

[1] Michail's experience of online radicalization is far from unique. In 2019, the *New York Times* published a profile of a young white American man, Caleb Cain, who says he was "brainwashed" by far-right extremist content promoted to him by YouTube's recommendation algorithm. The reporter writes, "Over years of reporting on internet culture, I've heard countless versions of Mr. Cain's story: an aimless young man — usually white, frequently interested in video games — visits YouTube looking for direction or distraction and is seduced by a community of far-right creators.… The common thread in many of these stories is YouTube and its recommendation algorithm, the software that determines which videos appear on users' home pages and inside the "Up Next" sidebar next to a video that is playing. The algorithm is responsible for more than 70 percent of all time spent on the site." Kevin Rose, "The Making of a YouTube Radical," NY TIMES (June 8, 2019), *available at* https://www.nytimes.com/interactive/2019/06/08/technology/ youtube-radical.html.

toilet, freezing throughout the winter, lacking hot water, isolated hundreds of miles from his family, he began to read the Bible and books on philosophy and history. Inmates from diverse backgrounds treated him with kindness, sending him food and messages of encouragement. Unable to access the internet and with countless hours for reflection on the kindness shown him by absolute strangers, he began to question his beliefs.

He recently told me that when he arrived at the MDC in May 2025, he still felt the hatred of his misanthropic worldview. He admits that part of him still craved the attention and validation he used to receive online as Commander Butcher. He deflected blame for his conduct. But he also continued his work on self-improvement. He assiduously attended church services and, through the teachings of the Bible, formed bonds of fellowship with people of color. On his own initiative, he read Nelson Mandela's autobiography *Long Walk to Freedom* and the 1963 bestseller *The Cross and the Switchblade* by David Wilkerson, a pastor to violent gang members and addicts in New York City. The effort he put into deradicalizing himself is impressive.

Michail is thoughtful and introspective. He has read the letters of the survivors of the Antioch, Tennessee school shooting, and their accounts consume him with remorse. He does not minimize the impact of his conduct. He wishes the Hater's Handbook would disappear from the world. He told me recently that no one who is a Nazi is "normal." He wants nothing more than to be normal himself, to live a normal life. Above all, he wants to have children while his mother, who is suffering from ███████ is still alive.

Enclosed with this submission are two expert reports. One is from Jason Blazakis, a professor at the Middlebury Institute of International Studies, where he also serves as the Executive Director of the Center on Terrorism, Extremism, and Counterterrorism (CTEC).[2] Formerly, as an Office Director at the Counterterrorism Bureau at the U.S. Department of State, Professor Blazakis interviewed terrorists and former terrorists, and he is one of the country's preeminent experts on accelerationist thought, violent extremism, and the transnational radical right. His report describes how social media and online spaces can radicalize young people like Michail. Professor Blazakis also conducted an extensive video interview of Michail and shares his impressions concerning Michail's offense and deradicalization with the Court.

The other report is by Richard Loeb, M.D. a clinical psychiatrist at NYU Langone Medical Center.[3] Dr. Loeb reviewed extensive materials, including

---

[2] *See* Ex. A.

[3] *See* Ex. B.

Michail's medical records, government filings in this case, the audio recording and transcript of Michail's interview by the FBI during his extradition to the United States, and Michail's PSR. He also interviewed Michail in person over two days earlier this month. He diagnoses Michail with ████████████████████ ████████████████████, and explains the interplay between those conditions and Michail's criminal conduct. In Dr. Loeb's opinion, the maturation of Michail's brain has contributed to increased psychological maturity, which in Dr. Loeb's words, "should continue to steer him towards prosocial and moderate views and activities, while steering him away from extremism."

Also enclosed with this submission are nearly two dozen letters of support from family and friends as well as one from the pastor of the Christian services Michail attends in the MDC.[4] The letters describe a shy, thoughtful young man who is kind and considerate to others, who is always ready to lend a helping hand, and who loves children and animals—a composite portrait that is completely at odds with Michail's online persona and activities. These letters make clear that Michail has a strong and caring support network in his native country.

Additionally, while at the MDC, Michail has taken courses on Greek tragedies and U.S. history that Colombia University offers to inmates. He did so entirely on his own initiative. Certificates of completion of three courses are enclosed with this letter.[5] They are clear evidence of Michail's efforts to improve his mind through the beneficial study of literature and history.

Finally, Michail has written a letter to the Court, which is enclosed.[6] Despite its imperfect grammar, his letter is a beautiful expression of genuine remorse and illustrates the transformation he has undergone since 2024.

These enclosed reports and other materials point to the necessity of a substantial downward variance under Section 3553(a). Michail's youth, history, and mental health issues represent significant mitigation for his conduct. A sentence of five years of imprisonment—which cannot be reduced under the First Step Act because of the nature of Michail's offense as well as his citizenship—represents a just punishment for his crimes while also achieving the goals of deterrence and protecting the public.

---

[4] *See* Ex. C.

[5] *See* Ex. D.

[6] *See* Ex. E.

## PROCEDURAL HISTORY

Michail was arrested on July 6, 2024 in Chişinău, Moldova on an arrest warrant issued in this case. He was arraigned on a four-count indictment in the Eastern District on May 23, 2025, and an order of detention was entered. He is currently housed in the MDC-Brooklyn.

On November 17, 2025, he pled guilty to Counts 2 and 3 of the indictment. Count 2 charges that between July 2022 and July 2024, Mr. Chkhikvishvili solicited violent hate crimes involving the use of explosive devices with the intent to kill or injure, all in violation of 18 U.S.C. § 373. Count 3 charges that Mr. Chkhikvishvili distributed bomb-making information with the intent that the information be used to commit violent hate crimes, all in violation of 18 U.S.C. §§ 842(p)(2)(A) and 844(a)(2).

According to his PSR, Michail's total offense level is 35 and he has zero criminal history points, resulting in a Criminal History Category of I and a guidelines range of 168 to 210 months. The defense does not object to this guidelines calculation. Probation has recommended a sentence of 120 months of custody on each count, to be served concurrently.

## MICHAIL'S HISTORY AND CHARACTERISTICS

Michail was born in August 2003 in Tblisi, Georgia. He was raised in an emotionally supportive family in comfortable economic circumstances. He has Jewish descent through his father's family, which was exiled to Kazakhstan during Stalin's regime. Upon returning to Georgia, Michail's paternal grandfather was forced to change his Jewish surname to a Georgian one. Michail grew up speaking Russian at home, which set him apart from most of his classmates, whose native language was Georgian. Michail's father states that the family celebrated Georgian, Armenian, Christian and Jewish traditions in their home. Michail's paternal grandmother lives in Brooklyn, New York.

By all accounts, Michail was a very shy child. He participated in many extracurricular activities but, according to his father, lacked self-confidence and found performing in public very difficult. (Such reticence stands in absolute contrast to his total lack of restraint online as Commander Butcher.) Numerous letters describe his unwavering kindness to his younger sister and cousins. Notably, during one holiday season, he dressed up as Santa Claus, much to the amusement of his little sister.

Starting around the age of six years old, Michail suffered significant bullying in school. He has described being violently assaulted by larger boys as well as being verbally attacked on a regular basis. After the fourth grade, he transferred to a

private school but had to return to the original school two years later when the private school was closed. The bullying resumed until the school divided the class. Michail had only a few school friends, and they have written letters of support.

When Michail was around 10 years old, his father began to struggle with alcoholism, and their relationship became distant. Around the age of 14, Michail himself started consuming alcohol, which exacerbated his growing feelings of worthlessness in response to the bullying and social rejection that he experienced at school.

According to Dr. Loeb's report, Michail has suffered from ████████████ since around the age of 15. His symptoms included despondency, self-isolation and suicidal and self-harming behaviors. He also suffered from ████████████ ██████ which reached its peak about a year before his arrest. According to Dr. Loeb, Michail was caught in a vicious cycle of ████████████████████ ████████████, each of which fed the other. Dr. Loeb stresses that Michail's substance abuse was not merely a failure of willpower; alcohol and substance abuse cause fundamental changes in the brain, especially in ████████ individuals.

Michail reports that, in late 2022 or early 2023, he hallucinated a voice while he was drunk that told him to kill himself. Dr. Loeb takes this as a sign that Michail's mental state was "very profoundly disordered." (Ex. B at 13). Michail received mental health treatment twice before his arrest. He saw a counselor in the seventh grade to address bullying and behavioral issues; he met with the counselor only a handful of times. Around the age of 16, he was required to see a psychologist weekly for about six months; he stopped seeing her, however, because he thought she was condescending and unsympathetic. Given Michail's severe adolescent ████████ Dr. Loeb believes he should have been treated aggressively, including through the prescription of ████████████████████████████████. Instead, his treatment for ████████ was sporadic, and he received no treatment for his alcohol abuse.

Everyone who knows Michail says he is not a violent or aggressive person. One letter deserves particular attention in this regard. Kevin Barry, a family friend who resides in Dublin, Ireland, recalls an experience with Michail that occurred in Tblisi in April 2024, a few months before Michail's arrest. Kevin states that, one evening, he had too much to drink and found himself in a dangerous situation. Kevin writes that Michail successfully de-escalated the tension and ensured that Kevin got home safe, for which he remains deeply grateful.

Michail has, by his own admission, exhibited violent behavior on a few occasions. He received counseling as a child after threatening to harm his classmates, and he told Dr. Loeb that when he was 19 he participated in an assault of an Egyptian hashish dealer, which did not result in serious injury. That Michail

told Dr. Loeb about this incident indicates his determination to hold nothing back during the interview.

As the letters of support make clear, Michael has the unwavering support of his extended family. While he was held in Moldova, his parents visited him on a few occasions. They have been unable to visit him since his extradition to the United States. Michail's mother is suffering from ███████, which she and Mihail attribute to the stress caused by his arrest and imprisonment. Michail is devoted to his mother and hopes she lives to see him complete his sentence. It is very important to him that she experience someday the joy of having grandchildren.

## **DISCUSSION**

A sentence of 60 months of confinement on each count, to be served concurrently, is sufficient but not greater than necessary to achieve the aims of sentencing set forth in 18 U.S.C. § 3553(a)(2).

Probation has recommended a below-guidelines sentence of 120 months of incarceration. In reaching that recommendation, Probation considered Michail's youth at the time he committed the offenses as well as his history of mental health issues as mitigating factors. Probation notes that while Michail committed the offenses online, his conduct created a credible threat to the Jewish community. Probation's sentencing recommendation also states that Maniac Murder Cult was responsible for several acts of violence around the world, referring to the violent acts set forth in Paragraph 27 of the PSR, which lists extremist attacks in Romania, Türkiye, and Tennessee between April 2022 and January 2025.

While we agree with Probation's assessment that more than a "nominal" sentence is required in this case, we believe that a 60-month sentence is both substantial and, more to the point, sufficient under the circumstances to achieve the goals of sentencing set forth in Section 3553(a). Probation did not have the benefit of considering, among other things, the two enclosed expert reports, the numerous letters of support, or Michail's own expression of remorse. As regards the harm caused by his conduct, Professor Blazakis' report makes clear that the assertion that a direct causal link exists between the Hater's Handbook and the school shooting that occurred in Tennessee oversimplifies the shooter's radicalization process, which like Michail's, was the product of a much broader ecosystem of online incitement to violence. Nor did Probation apparently consider the horrific conditions of confinement Michail experienced in Moldova's Prison No .13 between July 2024 and late May 2025, which amount to a violation of his human rights.

When viewed within the context of his life history, mental health struggles, disavowal of violent extremism, and genuine efforts to reform, Michail's offense,

albeit serious, does not warrant a decade of confinement in prison. Instead, 60 months of incarceration is sufficient under Section 3553(a).

## I. APPLICABLE LAW

As the Court knows, the Guidelines range is only "the starting point and the initial benchmark" for sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). Congress did "not intend that the guidelines be imposed in a mechanistic fashion." *United States v. Lara*, 905 F.2d 599, 604 (2d Cir. 1990) (*quoting* S. Rep. No. 225, 98th Cong., 2d Sess. 52, *reprinted in* 1984 U.S. Code Cong. & Admin. News 3182, 3235 (Legislative History)). Rather, it was Congress' view that "the sentencing judge has an obligation to consider all the relevant factors in a case and to impose a sentence outside the guidelines in an appropriate case." *Id.* After the Court calculates the applicable Guidelines range, it must consider the factors set forth in 18 U.S.C. § 3553(a), which include, *inter alia*, the nature and circumstances of the offense and the history and characteristics of the defendant as well as "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See* 18 U.S.C. § 3553(a). Section 3553(a) further provides that, in determining the appropriate sentence, the sentencing judge should "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## II. APPLICATION OF THE SECTION 3553(A) FACTORS

Here, a sentence of five years of imprisonment is sufficient to satisfy the Section 3553(a) factors.

There is no question that Michail's offense was serious. Holding himself out as a leader of the Neo-Nazi group Maniac Murder Cult, he solicited online an undercover agent in the United States to orchestrate an attack on Jews and racial minorities in New York. More specifically, he sent the agent a document entitled "The Mujahadeen Poisons Handbook," a document linked to jihadist groups, and

urged the agent to dress as Santa Claus and distribute ricin-laced candy to Jewish children on New Year's Eve. He also urged attacks on racial minorities and homeless people in New York through bombings, arson and poison. He provided the same undercover agent a Russian-language bomb-making manual and another Russian-language document containing instructions for committing acts of arson. Additionally, he has taken credit for being the author of the Hater's Handbook, which has been cited as an inspiration by several right-wing extremists who committed violent acts in Romania, Türkiye and Tennessee.

The seriousness of Michail's conduct is counterbalanced by his history and characteristics, which are outlined above. His descent into right-wing extremism occurred when he was just a child. Photos of Michail and his family taken when he was 15 are enclosed.[7] Guided by algorithms designed to hold users' attention, he consumed large quantities of extremist content online when he was at a very impressionable age and suffering from low self-esteem because of bullying and the delayed onset of puberty compared to his peers. Online extremist groups provided him a perceived community that he felt understood his problems and feelings of grievance against a world where he did not fit in. Contributing to the extremist group's activities offered him validation and a feeling of belonging, which is something that all people—and particularly adolescents—need and crave. (*See* Ex. B. at 14). In sum, online extremism gave Michail "a narrative and outlet where he could matter, belong, feel understood, and combat low self-esteem." (*Id.* at 15).

His romantic involvement as a teenager with an older Nazi woman in the United States resulted in the escalation of his extremist behavior. When she broke up with him in 2022, he found himself isolated, ███████ and abusing alcohol. He amplified his online rhetoric to get attention from his ex-girlfriend as well as Igor Krasnov, the adult founder of Maniac Murder Cult. Desperate for attention, profoundly under the influence of online extremist and Satanic groups, and suffering from ████████████████████, Michail escalated his behavior to the point where he committed the offenses in this case.

Michail's mental health and substance abuse disorders increased his susceptibility to radicalization:



---

[7] *See* Ex. F.

(Ex. B. at 13). Determining the just punishment for his offense should take these very significant mitigating factors into account.

On the other side of the coin, Michail has already experienced very severe punishment for his offense. Michail was in Moldova when he was arrested in July 2024 on an international warrant. He spent the following 11 months in solitary confinement in Prison No. 13, which is located in Chişinău, Moldova's capital. This prison is notorious for its inhumane conditions. The European Court of Human Rights has repeatedly found that conditions in Chişinău Prison No. 13 violate Article 3 of the European Convention on Human Rights. For example, in the case of of *Valentin Baştovoi v. the Republic of Moldova*, no. 61382/09, ECHR 2017, the European Court of Human Rights found that the conditions in Prison No. 13 violated the Convention's prohibition against inhuman or degrading treatment and described the problems as "recurrent" and "systemic."[8] Likewise, the State Department's 2023 Human Rights Report on Moldova cites credible reports of "harsh and life-threatening prison conditions."[9] According to the report, abusive physical conditions prevail throughout Moldovan prisons:

> Conditions in most prisons and detention centers remained harsh, due to overcrowding, poor sanitation, lack of privacy, insufficient or no access to outdoor exercise, and a lack of facilities for persons with disabilities.[10]

Moreover, according to the State Department, "[c]onditions at Penitentiary No. 13 in Chişinău were reportedly the worst in the country."[11] Rights groups have repeatedly called for the prison to be closed.

Michail's experience there was horrific. For 11 months he was held in solitary confinement, which meant he was locked in a tiny cell 23 hours a day. The only other people he saw were prison guards. He was fed rotten food that he could not eat. There were rats in his cell, and bed bugs tormented him. The cell was filthy and

---

[8] *See* Ex. G (Press Release, "Inhuman and degrading conditions of detention in Chişinău Prison no. 13 breach the Convention," European Court of Human Rights (Nov. 28, 2017)).

[9] United States Department of State, "Moldova 2023 Human Rights Report," available at https://www.state.gov/wp-content/uploads/2024/02/528267_MOLDOVA-2023-HUMAN-RIGHTS-REPORT.pdf?utm_source=chatgpt.com, at 1.

[10] *Id.* at 5.

[11] *Id.*

unhygienic; it was impossible to make his cell clean. There was no proper toilet, just a hole in the floor, and he had no hot water. The window to his cell had no glass, and in winter the cold was unbearable.

These conditions of detention warrant a substantial downward variance. In a pre-*Booker* case, the Second Circuit held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures." *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001). *See also United States v. Salvador*, 2006 U.S. Dist. LEXIS 49543, at *14 (S.D.N.Y. Jul 19, 2006) (holding that cruel prison conditions defendant experienced in Dominican Republic while awaiting extradition, including "an almost complete lack of even minimal sanitary conditions," warranted a downward departure); *United States v. Torres*, 2005 U.S. Dist. LEXIS 18546, at *4-*5 (S.D.N.Y. Aug. 29, 2005) (holding that conditions in Colombia's Combita prison, including cell windows without glass, low temperatures, and lack of hot water, warranted a downward departure). The conditions of Michail's detention in Moldova arguably amounted to torture, and the determination of the just punishment commensurate with the seriousness of his offense should consider his experience during those 11 months.

Conditions have also been difficult, albeit not as harrowing, at the Brooklyn-MDC. Michail has spent his time there very productively, taking college-level classes, reading serious literature and keeping out of trouble. Nevertheless, likely because of the nature of his offense, he was violently assaulted by another inmate in December 2025. In an unprovoked attack, he was punched in the face, resulting in a black eye. He did not report the assault for fear of further retaliation if he "snitched." However, his facial injuries inevitably came to the attention of the jail's staff, and he was administered an x-ray to determine the extent of the damage, which fortunately was not serious.[12]

A 60-month sentence is also sufficient to achieve the goal of deterrence in this case. With respect to general deterrence, studies have found that it is the certainty of punishment, as opposed to the severity of the sentence, that achieves deterrence. *See*, *e.g.*, Gary Kleck, *et al.*, "The Missing Link in General Deterrence Theory," 43 Criminology 623, 653 (2005); Andrew Von Hirsch, *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"). For the general public, a significant downward variance will not result in a marginal reduction of the deterrent effect of the sentence the Court imposes.

---

[12] *See* Ex. H (medical record of x-ray referencing "RIGHT lower orbit tenderness s/p [status post] altercation").

With respect to specific deterrence, a sentence greater than five years is greater than necessary because Michail has never previously served even a day in jail. He is a young person who made a very terrible mistake for which he has already paid dearly. Thus, a five-year sentence represents a sufficient wake-up call for Michail to avoid breaking the laws of the United States or any other country in the future.

Finally, it is unnecessary to impose a sentence of more than five years to protect the public from Michail's committing other crimes in the future. He has taken tremendous strides towards rehabilitation by deprogramming himself from violent extremism. He disavows Nazism and Satanism and sees them as abnormal and abhorrent. Indeed, according to Dr. Loeb, his progress is attributable in a large degree simply to the development of his brain; in short, he has matured. Furthermore, his expressions of remorse for his conduct come across as entirely genuine. He has been a model prisoner while at the MDC, despite the hostility of the environment there to white supremacists. Through study and introspection, he has learned to love and understand those who are different from him. There is very little likelihood he will ever recidivate.

## CONCLUSION

For the foregoing reasons, I respectfully submit that the Section 3553(a) factors will be satisfied by a sentence of 60 months. The sentence proposed is sufficient to reflect the seriousness of Michail's crime while taking into account the significant mitigation for his offense as well as the extremely harsh conditions of confinement he endured in Moldova while awaiting extradition.

Respectfully submitted,

Zachary S. Taylor

cc:     Ellen Sise, Esq.
        Andrew Reich, Esq.
            Assistant United States Attorneys

Encl(s).