

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

NJM:EHS/ADR
F. #2023R00792

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 6, 2026

**TO BE FILED IN REDACTED FORM**

By ECF

The Honorable Carol B. Amon
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:    United States v. Michail Chkhikvishvili
>        Criminal Docket No. 24-286 (CBA)

Dear Judge Amon:

The government respectfully submits this letter in advance of the defendant Michail Chkhikvishvili's sentencing, which is scheduled for May 13, 2026 at 10:00 a.m. Known as "Commander Butcher," the defendant was the leader of Maniac Murder Cult (also known as "MMC" and "MKY"), an international neo-Nazi extremist group. The defendant repeatedly encouraged and instructed others, primarily on the encryption-enabled messaging platform Telegram, to commit violent hate crimes and other acts of violence on behalf of MKY. He was successful. The defendant's calls for violence resulted in real-world mass violence, including a school shooting in Nashville, Tennessee, and the stabbing of five people in Turkey. The defendant praised successful attacks and provided his followers with operational support to carry out their own attacks. And he insisted that they record those attacks to prove they were executed and to promote MKY. His conduct culminated in the solicitation of acts of mass violence against children in New York City from an individual who, unbeknownst to the defendant, was an undercover law enforcement employee, and the active planning of those attacks in coordination with that person.

For the reasons set forth below, the government requests that the Court impose a sentence of 210 months' imprisonment, reflecting the high end of the advisory United States Sentencing Guidelines ("Guidelines") range of 168 to 210 months' imprisonment. Such a sentence is the only one that would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

I.        Background[1]

        A.        Maniac Murder Cult ("MKY")

MKY is a Russian- and Ukrainian-based racially and ethnically motivated violent extremist ("RMVE") group with members in the United States and around the world.  It has been designated a Proscribed Terrorist Group in the United Kingdom and a listed "terrorist entity" in Canada, among other designations in additional countries.  MKY adheres to a neo-Nazi accelerationist ideology and promotes violence against racial minorities, the Jewish community, and other groups it deems "undesirables."  PSR ¶¶ 6-7.[2]  MKY members share a common goal of challenging social order and governments via terrorism and violent acts that promote fear and chaos.  *Id.* ¶ 7.  MKY members and recruits have regularly communicated through Telegram, the encryption-enabled social media and mobile messaging service.  *Id.* ¶ 8.  Telegram advertises itself as a secure and untraceable communications platform.  *Id.*  It allows users to communicate one on one, in public or private group chats, and through "channels."  As defined by Telegram, channels are a tool for broadcasting public messages to large audiences and can have an unlimited number of subscribers.

MKY channels have been used to share videos depicting and encouraging acts of violence on behalf of MKY, including what appear to be beatings, stabbings, and other assaults. *Id.*  Posts in these channels have also specifically sought to recruit people with experience working with explosives and with biological and chemical weapons to engage in mass violence.  *Id.*  Below are examples of propaganda images posted in Telegram channels and chats associated with MKY:

  

---

[1]        Unless otherwise noted, the facts described herein are drawn from the Presentence Investigation Report ("PSR") dated February 2, 2026, and the charging documents and factual record in this case.

[2]        Accelerationism is an ideology that promotes violent actions and sabotage as a means to accelerate the perceived inevitable collapse of society, allowing followers to establish a white ethno-state in the aftermath.



*Russian Translation: "Maniacs Murder Cult"*





The defendant, a Georgian national who uses the alias "Commander Butcher," among other aliases, has held himself out to be a "recruiter," "administrator," and "curator" for MKY, and ultimately its "leader." *Id.* ¶ 9. Since in or about September 2021, the defendant has published various editions of an English-language manifesto titled the "Hater's Handbook," which has been distributed on MKY Telegram channels and elsewhere. *Id.* A third edition of the Haters Handbook was circulated in or about October 2023, authored by "Commander Butcher and the MMC Collective." *Id.* The Handbook discusses MKY's principles and encourages members to engage in acts of violence in furtherance of those principles. Chapter titles include "Weapons of Anarchy" and "White Race One Race." *Id.* The introduction to the third edition of the Hater's Handbook states in part:

> I'm Commander Butcher National-Socialist since birth and curator
> of MMC also known as Maniacs Murder Cult . . . .  I can proudly
> say I've murdered for white race and willing to bring more of chaos
> in this rotten world.  This book is for readers who are cruel warriors

> or are willing to become one and are ready to step on massive actions . . . . Our main goal is to spread flames of Lucifer and continue his mission of ethnic cleansing, great drive of purification.

*Id.* Members of RMVE groups like MKY use the phrase "actions" to mean violent acts in furtherance of the groups' ideologies. *Id.* Among other things, the Hater's Handbook encourages its readers to commit school shootings and to use children to perpetrate suicide bombings and other mass killings targeting racial minorities. The document describes methods and strategies for committing mass "terror attacks," including, for example, using vehicles to target "large outdoor festivals, conventions, celebrations and parades" and "pedestrian congested streets." It also specifically encourages committing attacks within the United States. The defendant, pictured below, distributed and promoted the Hater's Handbook on various platforms. A copy of the Hater's Handbook is attached hereto under seal as Exhibit A.[3]

 

---

[3] The government respectfully requests permission to file Exhibits A, B and C to this memorandum under seal as they contain, respectively: (i) methods and means of committing mass violence, including instructions on explosives and poisons; (ii) sensitive victim information; and (iii) personal medical information of the defendant. *See United States v. Amodeo*, 71 F.3d 1044, 1050-51 (2d Cir. 1995); *Offor v. Mercy Med. Ctr.*, 167 F. Supp. 3d 414, 445 (E.D.N.Y. 2016), *vacated in part on other grounds*, 676 F. App'x 51 (2d Cir. 2017). For those same reasons, the government respectfully requests permission to redact portions of this memorandum.



B.    The Defendant's Offense Conduct

Beginning at least as early as July 2022, the defendant has encouraged others over Telegram, Wire (another encrypted communication platform), and other platforms, to commit acts of violence on behalf of MKY, including soliciting acts of mass violence in New York from an undercover FBI employee ("UC-1") whom the defendant believed to be a prospective MKY recruit. *Id.* ¶ 11. The defendant also made violent threats on Instagram, including threats to kill his former romantic interest ("Individual-1").

1.    Communications with Since-Convicted White Supremacist Leader

In or about and between July 2022 and March 2023, the defendant engaged in extensive communications over Telegram with Nicholas Welker, an individual who at the time was the leader of an international RMVE group called Feuerkrieg Division ("FKD"). *Id.* ¶ 12. Like MKY, FKD adhered to a neo-Nazi ideology and targeted racial minorities, the Jewish community, the LGBTQ community and journalists. *Id.* In or about September 2023, Welker pleaded guilty to federal charges for making death threats against a Brooklyn-based journalist in response to the journalist's investigation of racially motivated violent extremists. *See United States v. Welker*, No. 23-CR-141 (PKC). On or about April 19, 2024, Welker was sentenced to 44 months' imprisonment by the Honorable Pamela K. Chen (14 months above the high end of the United States Sentencing Guidelines range of 24 to 30 months). *See id.*, ECF No. 38.

6

The defendant communicated with Welker about committing acts of violence against Jewish victims and others on behalf of MKY in the United States. PSR ¶ 13. For example, on or about July 19, 2022, the defendant stated, "Mky is only group so far that done so many kills." On or about August 26, 2022, the defendant stated, "Mky members preparing actions soon." Before that, on or about July 3, 2022, the defendant messaged Welker, "Is there anyway to get unmarked guns here [*i.e.*, in the United States]?" and "Besides killing we should rob victims too." The defendant also bragged to Welker that he harmed and attempted to kill a Jewish victim in Brooklyn, New York. Specifically, on or about July 11, 2022, the defendant messaged Welker, "I'm working in rehab center privately in Jewish family // I get paid to torture dying jew // I think I almost killed him today actually // If he dies soon that's killstrike on me." *Id.* ¶ 15. The defendant sent Welker multiple images of his purported client in a hospital bed and bragged about harming the client. Law enforcement personnel were able to identify the Brooklyn-based rehabilitation facility referenced by the defendant and spoke with members of the Orthodox Jewish family which employed him. *Id.* The defendant worked for the family and the now-deceased victim for several weeks and then left with little notice. (The government does not allege that the defendant's actions in fact resulted in this individual's death, but it is clear from the defendant's communications that that is what the defendant intended to suggest to Welker).

The defendant and Welker discussed MKY at length and repeatedly discussed targeting Jewish people and racial minorities with violence until Welker's arrest in late March 2023. For example, on July 3, 2022, the defendant stated, "Bloody beating isn't enough // Killing and grinding is now important." Welker responded, "Done to the right 'people' of course // Der Untermensch." "Der Untermensch" is a German phrase that roughly translates to "the subhuman" and was used by members of the Nazi party during World War II to refer to non-Aryan individuals deemed to be inferior. On July 4, 2022, Welker reiterated, "I just save my rage for the right people," "That's why I'm NS [National Socialist] // Because I love my race." Welker added, "Hate is a necessary response // To what threatens you." That same day, the defendant stated, "I want to grind with homies on cash // And kill people." On July 13, 2022, Welker told the defendant, "Yes I agree killing, when for the right reasons is natural and not evil." He added, "Jews have softened the world up and brainwashed the general population into thinking: KILLING BAD!"

On December 4, 2022, Welker told the defendant, "I wanna do some action against trash badly." As discussed above, members of RMVE groups like MKY use the phrase "actions" to mean violent acts in furtherance of the groups' ideologies. The defendant responded, "I'm gonna murder again // This time on camera // Because it's funny." *Id.* ¶ 14. Welker replied, "But idk im tryna be smart" (*i.e.*, not get caught, including by soliciting others to commit violent crimes rather than committing them himself). *Id.* To that end, Welker referenced the idea discussed in the Hater's Handbook that white individuals should cause individuals of racial minority groups to commit violent acts upon other individuals of racial minority groups. *Id.* On July 4, 2022, Welker messaged the defendant, "As far as using non NS and non whites for action, where I live is perfect for that," and "We just need to give them motivation."

The defendant also discussed taking steps to shield his criminal actions from law enforcement authorities. On or about March 20, 2023, Welker relayed a series of questions to the defendant over Telegram from an individual seeking to join MKY and to learn its methods. Among other things, Welker asked on behalf of the individual, "Is there any way in particular MKY avoided the footage of their ultraviolence challenge submissions being traced to them? I

7

think the obvious starters would be of course VPNs and posting the content on encrypted sites from anon accounts."  The defendant responded, "You remove metadata from video first // Or from any file committing such crime as murder which will be investigated."  The government understands Welker's reference to MKY's "ultraviolence challenge submissions" to mean MKY's practice of encouraging its recruits and members to film themselves committing acts of violence and to distribute the videos.  Below is a still image from an MKY propaganda video publicizing the "ultraviolence challenge."



Thereafter, Welker asked the defendant if he should put the individual directly in touch with the defendant so that they could discuss how the individual could join MKY.  The defendant responded, "Just explain to them what membership in mky means and what actions should be recorded in good quality Beating, Arson, Killing // Beating brutal one not regular."  *Id.* ¶ 13.

### 2. Solicitation of Acts of Mass Violence Against Jewish People, Racial Minorities, and the Homeless

From in or about September 2023 through his arrest, the defendant communicated on Telegram and Wire with UC-1, an undercover FBI employee whom the defendant believed to be a prospective MKY member.  During the course of the communications, the defendant made detailed and specific overtures to UC-1 to commit acts of mass violence—in particular, murders of Jewish people, racial minorities, and homeless individuals in New York City—on behalf of MKY, including bombings, arson, and the spreading of poisons such as ricin.  *Id.* ¶ 18.

8

For example, on or about September 8, 2023, the defendant messaged UC-1 about recruiting "maniacs" to join MKY and told UC-1 that he was in the process of writing the third edition of the Hater's Handbook, which would address "direct actions." *Id.* ¶ 19. The defendant stated, "I see USA as big potential because accessibility to firearms and other resources." The defendant sent UC-1 links to violent videos that he described as "murder vids" and directed UC-1 to a Telegram channel where he could view additional videos of "hardcore actions" such as "videos of mky beheading and blowing up busses." *Id.* The channel contained videos depicting assaults and graphic violence.

In the same conversation, UC-1 asked the defendant whether there was an application process to join MKY. The defendant responded, "Well yes we ask people for brutal beating, arson/explosion or murder vids on camera." He stated that "[p]oisoning and arson are best options for murder," and suggested also considering a larger "massmurder[]" within the United States. The defendant advised UC-1 that the victims of these acts should be "low race targets." *Id.* Later that month, the defendant began to provide more specific instructions to UC-1 for committing a violent attack. On or about September 29, 2023, UC-1 asked the defendant what kind of "action" he should take to join MKY. *Id.* The defendant suggested making a homemade explosive device. He provided guidance as depicted below:

The defendant further told UC-1, "We have to choose our target first," and later followed up asking, "So who are we targeting?" The defendant sent UC-1 files titled "MMC – COLD WEAPON" and "MMC – MANHUNT INSTRUCTION" and stated, "I want you to read those." *Id.* ¶ 19. The "Cold Weapon" document described how to attack and kill victims using knives, hammers, screwdrivers, and other weapons. The "Manhunt Instruction" document described how to avoid detection by law enforcement authorities after attacking and killing victims, for example by changing clothes and hiding weapons.

The defendant also sent UC-1 several detailed manuals on building explosive devices. For example, he sent UC-1 a file called "Detonator," which was a Russian-language bomb-making manual. The document provided a step-by-step guide on creating the various components of an explosive device, including the types and amounts of chemicals needed and how to mix them. *Id.* ¶ 20. The defendant advised that "murdering anyone in USA supports mky tbh // Big opportunity." The same day, on or about September 29, 2023, the defendant sent UC-1 a Russian-language document containing detailed instructions for committing acts of arson. *Id.* The defendant stated, "This is very good arson guide it's on [sic] Russian // Just translate pdf." The defendant told UC-1, "When you finish reading all pdf-s we will on targets // You can even arson

9

with no trace even nyc." UC-1 indicated that he would travel from Pennsylvania to New York City to execute the attack. The defendant instructed UC-1 to target places and materials that would burn well and sustain damage, and further suggested targeting "homeless people" because the government would not care "[e]ven if they die." *Id.* The defendant thereafter provided additional instructions to UC-1 for creating explosive devices. For example, on or about September 29, 2023, he wrote, "For simple Molotov ███████████████████," "There's also one recipe worth of trying // ████████████████████████████ // Its like flammable bomb."

As described above, the purpose of the defendant's communications was to solicit violence and acts of murder on behalf of MKY. On or about October 17, 2023 the defendant told UC-1, "Just gotta make sure many people gonna die really by our hands." The defendant instructed UC-1 to "[t]ry to record video" or else it would be a "lost action." The defendant also repeatedly emphasized MKY members' readiness to commit actual acts of violence rather than merely discussing them. For example, comparing MKY to another group, the defendant bragged that "We murder they larp." "[L]arp" is a reference to "Live Action Role Playing" games, in which individuals dress in costume and portray fictional characters. The defendant later praised individuals who "killed" as compared to individuals who did not and were therefore "fags," a derogatory slur for gay men. The defendant also made repeated complimentary references to Islamic jihad—the violent and radical ideology followed by members and supporters of foreign terrorist organizations like ISIS and al Qaeda—and commented that he would "blow up myself with pleasure." *Id.* ¶ 21.

On or about October 17, 2023, the defendant instructed UC-1 to download Wire because Telegram was not "safe" (*i.e.*, that law enforcement could obtain his Telegram communications). The defendant sent UC-1 his usernames for those platforms. *Id.* ¶ 22. On or about October 30, 2023, the defendant sent UC-1 a PDF copy of the Hater's Handbook. Soon thereafter, the defendant began communicating with UC-1 on Wire about the schemes they had previously discussed. On or about October 31, 2023, UC-1 told the defendant that he had made and tested Molotov cocktails and was having trouble using them. *Id.* The defendant responded, "Sometimes don't explode right?," indicating his own familiarity with making and using Molotov cocktails.

The defendant also devised another violent scheme and provided UC-1 with detailed instructions on carrying it out. On or about November 2, 2023, the defendant told UC-1 that he could "do bigger action than Breivik without getting caught." ("Breivik" is a reference to Anders Behring Breivik, a Norwegian neo-Nazi who killed 77 people in a bombing and mass shooting in Norway in 2011.) In particular, the defendant devised a scheme to murder racial minorities and others in New York City on New Year's Eve by dressing up as Santa Claus and

10

handing out candy laced with poison.  *Id.* ¶ 23.  The defendant relayed step-by-step instructions on how UC-1 could successfully execute the scheme without getting caught, as depicted below:

**BUTCHER** Nov 2, 6:28 AM

Planning:
- Buy poison materials, clothes and chocolate candies anonymously using delivery services or paying with cash at store, which haven't been withdrawn from your bank account
- Create fake job with fake number, alternative phone. (Needed Santa's in NYC). Send workers stuff required for job, equipment and carry out some part by yourself.
- if doing by yourself, stick sweater to gloves by duct tapes, same for socks and leggins inside Santa uniform, use white Santa gloves and bag full of candies. Big beard, makeup, glasses, shave unekscesarry body hair and put fake white eyebrows.
- After giving around poisoned candies to many racial minorities and traitors, just go to taxi, pay to go somewhere, where you will have alternative clothes (don't tell exact location

To driver) and burn Santa clothes and equipment, again use another clothes to go back to home unseen, get rid of alt phones, etc

And most important it must be done on 31 December

You can also install Santa socks with candies in random apartments with no much control

The defendant also sent UC-1 a lengthy document titled "The Mujahideen Poisons Handbook" and instructed him that "ricin would be most simple."  The document contained detailed instructions on creating and mixing lethal poisons and gases to further the cause of "Islamic jihad."  The Mujahideen Poisons Handbook is a document linked to radical Islamist jihadist groups and designated foreign terrorist organizations such as ISIS.  The defendant instructed UC-1 on the methods of making ricin-based poison in powder and liquid form, including by extracting ricin from castor beans.  *Id.* ¶ 24.  The scheme was intended to cause violence in furtherance of MKY's ideology.  The defendant stated to UC-1, "Once you do poison attack, I'll do message against US government" (*i.e.*, a public message attributing the attack to MKY and its ideologies).  On or about November 17, 2023, UC-1 told the defendant that he had obtained materials for extracting ricin and that the plan was on track.  The defendant also indicated to UC-1 that he (the defendant) wanted to use ricin and asked UC-1 how to obtain ricin or castor beans to make ricin.

On or about December 8, 2023, the defendant contacted UC-1 on Telegram again, stating, "It's me Butcher / Don't give this acc [*i.e.*, account] to anyone."  The defendant pressed UC-1 for updates on the poison scheme and UC-1 responded that "your plan is in motion."  On or

11

about December 19, 2023, the defendant messaged UC-1, "Anything new on castor?"  This was a reference to extracting ricin poison from castor beans, further to the instructions previously sent by the defendant to UC-1, described above.  *Id.* ¶ 25.  UC-1 replied that he was in the process of testing the poison he had made.  The defendant responded, "I'm glad process is going on" and asked UC-1, "Well how many human doses asides from test ones we got?"  UC-1 responded that he had a small amount, and the defendant stated, "Well we've got no much time left brother" and that "New Year is coming."  The defendant asked UC-1 how he wanted to be credited in the "mky video" the defendant planned to post after a successful attack.  *Id.*

On or about December 28, 2023, the defendant asked UC-1 how the ricin tests were going and discussed testing the ricin on small animals.  He told UC-1 that the plan did not need to happen on New Year's Eve and that they could go forward with it in January if needed.  On or about January 9, 2024, the defendant followed up again about the ricin and asked UC-1, "So when do you think you'll be able to test it on humans?"  *Id.*  The defendant told UC-1 that they should execute the plan where there would be the "most people operating" and suggested targeting the "Jewish community."   The defendant further noted that "Jews are literally everywhere" in Brooklyn and suggested executing the attack on "some Jewish holiday" and at "Jewish schools full of kids."  *Id.*  He emphasized, "Dead Jewish kids."  The defendant further discussed publishing a video of the planned attack and bragged that "MMC [*i.e.,* MKY] will become bigger than Al Qaeda once it drops."  *Id.*  UC-1 warned the defendant that the attack would "bring alot [sic] of heat on MKY tho [] // just as long as you are good with that."  The defendant responded, "That's what we exactly want."  On or about January 18, 2024, the defendant asked UC-1, "When should I expect news?"  The following day, he again encouraged UC-1 to give the poisoned candy to "[s]mall Jewish kids" and suggested he "disguise" himself as a "Jew."

### 3.     Violent Threats on Instagram

The defendant has also made violent threats on Instagram including threats to kill Individual-1, a former girlfriend.  In or about October and November 2023, the defendant sent messages to multiple unknown users on Instagram from an account with username "human666grinder" in which he discussed committing acts of violence on behalf of MKY and relayed portions of the Haters Handbook.  *Id.* ¶ 16.  Below are several examples:

> human666grinder - 10/30/2023 9:42:12am PDT: MKU/MMC is Maniacs Murder Cult created in Ukraine by Yegor Krasnov

> human666grinder - 10/30/2023 9:42:32am PDT: It's terrorist organization carrying terror attack and murders

> \* \* \*

human666grinder - 2023/11/01 00:21 PDT:



human666grinder - 2023/10/30 09:36 PDT:



human666grinder - 2023/10/26 00:53 PDT:  Many falsehoods will come amongst our numbers, or will try to call themselves NS [National Socialist].  There's no room for you unless you have truly done something and it's not going to gym or wiping off trash in nature, but only spilling blood of enemies, otherwise you are regular normie.  We won't show mercy to anyone, everyone against our nihil ideas should be exterminated as well.



* * *

human666grinder - 10/06/2023 11:07:13am PDT: I fucking hate n[****]rs

human666grinder - 10/06/2023 11:07:16am PDT: It's unreal

▮▮▮▮▮▮▮▮ - 10/06/2023 11:07:21am PDT: Me too

▮▮▮▮▮▮▮▮ - 10/06/2023 11:07:23am PDT: And gas

▮▮▮▮▮▮▮▮ - 10/06/2023 11:07:24am PDT: Gays

human666grinder - 10/06/2023 11:07:30am PDT: And Jews

human666grinder - 10/06/2023 11:07:35am PDT: And Asians

▮▮▮▮▮▮▮▮ - 10/06/2023 11:07:36am PDT: Preach

* * *

human666grinder - 10/06/2023 11:09:33am PDT: Have you heard of MKU/MMC

▮▮▮▮▮▮▮▮ - 10/06/2023 11:09:40am PDT: No

14

███████████ - 10/06/2023 11:09:42am PDT: What is it

human666grinder - 10/06/2023 11:09:55am PDT: It's maniacs murder cult created in 2017

human666grinder - 10/06/2023 11:10:15am PDT: Carrying over 50 murder and 150+ other actions

* * *

human666grinder - 10/08/2023 7:12:54am PDT: Keep looking on haters handbook 3rd edition

███████████ - 10/08/2023 7:13:01am PDT: Idk what that is

human666grinder - 10/08/2023 7:13:08am PDT: Book

human666grinder - 10/08/2023 7:13:18am PDT: It will be published on Halloween

* * *

human666grinder - 10/08/2023 8:09:38am PDT: Glory to total rape and death of whores

███████████ - 10/08/2023 8:09:48am PDT: Amen

* * *

███████████ - 10/30/2023 4:54:36am PDT: Stupid Jew cucks

human666grinder - 10/30/2023 4:55:27am PDT: They all will be burned in one bloody pot

     In additional conversations, the defendant stated that he was considering traveling to the United States, that it was a "good place for illegal grind," and that he was "[g]onna poison half of nyc," "bomb NYC," and "kill everyone there." The defendant bragged that he had "[k]illed a Jew," that he was "glad I have murdered," and that "I will murder more" but "make others murder first." *Id.*

15

The defendant also distributed a video depicting the gruesome torturing and killing of small animals and posted MKY recruitment materials from the "human666grinder" account on Instagram, as depicted below:



*Id.* ¶ 17. Lastly, the defendant contacted Individual-1 in late 2023 via direct message on Instagram using the "human666grinder" account. The defendant made threats toward her including that he wanted to kill her. The defendant boasted about having committed acts of violence such as rape, and told Individual-1 that he wanted to destroy the United States government. *Id.*

        4.      <u>June 2024 Conduct Immediately Preceding Arrest</u>

The defendant's violent conduct was at a peak in June 2024, disrupted only by his arrest. During that month:

- The defendant posted a video in a neo-Nazi accelerationist Telegram chat room and various other chat rooms of an attack on a victim by members of MKY purportedly using hydrogen chloride gas. He also forwarded the video to UC-1. The video included instructions for making the gas and the defendant's contact information. Evidence on the defendant's phone indicated that he produced the video from footage that was provided to him by an MKY member on whom he had bestowed the alias "hitman88." In an earlier conversation with that individual, the defendant praised the attack and requested instructions for making

16

the gas that was used.  The defendant instructed the individual to "film him dead" (referring to the victim).  Below is an image from the video encouraging others to join the cause and to contact the defendant.



- The defendant encouraged another Telegram user to commit acts of violence.  In the conversation, the defendant asked the user if she had "heard about mky before" and discussed the Hater's Handbook with her.  The defendant offered to teach the user "useful skills" to kill someone in "clean ways [] that look as natural death."  He further stated that he did not "waste time" with "larpers," (*i.e.*, those merely engaged in fantasy roleplaying as discussed above) and "keyboard warrior kids" (*i.e.*, those who engage online but don't take real action).

- The defendant communicated with others in MKY about selling child sexual abuse material ("CSAM").  Following his arrest, law enforcement agents found on his mobile device more than one hundred images and several videos containing CSAM, including depictions of children under the age of five performing sexual acts on adults and other children.  The defendant was in at least three channels and/or group chats on Telegram in which CSAM was distributed.

- The defendant distributed an MKY document called "Mechanics of the Cult," which had previously appeared in the Hater's Handbook and had been circulated throughout MKY chats.  The document outlined various aspects of MKY's ideology and provided instructions on obtaining membership in MKY, including instructing prospective members to commit "swatting[s]," "murders," "beatings," "arson" and "terrorist attacks" (including

through the use of explosives and biological weapons).  The document further outlined a points-based system to evaluate the status and productivity of MKY members.  Members were required to earn a certain number of points per month to maintain their status.  Points were awarded for violent acts committed by members and other pro-MKY activities, with different amounts allotted for different conduct.  Members also received points for recruiting other members.  After he distributed the document, other members of the chat discussed ways of obtaining "murder points," and one member suggested "kill[ing] a homeless person."

- The defendant discussed "murder points" with others as well prior to June 2024.  In one such conversation that he later discussed with Individual-1 in March 2024, depicted below, he instructed an individual to "record brutal beating and if possible with hammer or any other cold weapon, after that you will pass test and will receive murder points for each action and help done for cult."  He instructed the individual to make the video "long, bloody and violent" and not to edit the video because the defendant would edit it himself.  In April 2024 the defendant told another individual that MKY engaged in "[b]rutal beatings," "arson," "explosions" and "murders," and that MKY "counts over 50+ murders 150+ other actions."  He added, "[w]e target much bigger now."  When the individual asked the defendant, "[y]ou don't feel any kind of guilt or regret?" the defendant responded, "0."



18

The defendant also stored extensive violent MKY propaganda on his phone, including the examples depicted below, and distributed such propaganda frequently.

 



*Russian Translation Upper Right Corner: "Maniacs Murder Cult"*

C.    Charges, Extradition and Guilty Plea

The defendant was arrested on July 6, 2024, in Chişinău, Moldova, while attempting to travel from Georgia to Ukraine. On July 15, 2024, an indictment was unsealed in this district charging him with: (i) soliciting and conspiring to solicit hate crimes and other violent felonies, in violation of 18 U.S.C. §§ 371 and 373 (Counts One and Two); (ii) distributing instructions on making explosives and poisons in furtherance of violent felonies, in violation of 18 U.S.C. § 842(p) (Count Three); and (iii) transmitting threatening communications, in violation of 18 U.S.C. § 875(c) (Count Four), all during the time period July 2022 through July 2024. *See* ECF No. 4. The defendant was extradited to the United States on May 22, 2025, and detained pending trial. On November 17, 2025, the defendant pleaded guilty to one count of soliciting violent felonies in violation of 18 U.S.C. § 373, and one count of distributing instructions to make explosive devices and poisons, in violation of 18 U.S.C. § 842(p)(2)(A).

II.    Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration, and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable. [The court] must make an individualized assessment based on the facts presented." *Id.* at 50 (citation and footnote omitted). When a factor is already included in the calculation of the [G]uidelines sentencing range, a judge who wishes to rely on that same factor to impose a sentence above or below the range must articulate specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the [G]uidelines calculation." *United States v. Sindima*, 488 F.3d 81, 87 (2d Cir. 2007) (quotation omitted, alterations in original).

Title 18, United States Code, Section 3553(a) provides that, in imposing a sentence, a court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; [and]

20

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." *United States v. Alexander*, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts. To the extent there remain any open issues as to the correct Guidelines range, the Court should first make any necessary finding regarding the correct range. Nevertheless, however the Court arrives at the correct Guidelines range, it still must fashion a sentence that meets the criteria of Section 3553(a) under the specific facts of the case.

III.    Guidelines Calculation

The parties agree with Probation's calculation of the offense level in the PSR, ¶¶ 33-44, set forth below. Counts Two and Three are grouped because they involve multiple acts connected by a common criminal objective or constituting a common scheme or plan. *Id.* ¶ 34 (citing U.S.S.G. § 3D1.2(b)). In such cases, the highest offense level of the counts in the group is used. *Id.* (citing § 3D1.3(a)). Here, Count Two carries the highest offense level:

<u>Count Two: Soliciting Violent Felonies</u>

| | | |
|---|---|---:|
| Base Offense Level (U.S.S.G. § 2A1.5(a)) | | 33 |
| Plus: | Hate Crime Motivation (U.S.S.G. § 3A1.1(a)) | +3 |
| Plus: | Aggravating Role Enhancement (U.S.S.G. § 3B1.1(c)) | +2 |
| Less: | Acceptance of Responsibility (U.S.S.G. §§ 3E1.1(a), (b)) | <u>-3</u> |
| Total: | | <u>35</u> |

*Id.* ¶¶ 35-44. Based on a Criminal History Category of I, the defendant's Guidelines are 168 to 210 months' imprisonment. *Id.* ¶ 83. The defendant stipulated to this Guidelines calculation in the plea agreement.

IV.     A High Guidelines Sentence Is Appropriate

The government respectfully submits that a 210-month sentence, at the high end of the advisory Guidelines range of 168 to 210 months' imprisonment, is appropriate in this case. The sentencing factors articulated in 18 U.S.C. § 3553(a) underscore the need for a substantial sentence.

A.      The Defendant's Repeated, Successful Solicitations of Hate Crimes and Mass Violence Warrant a Significant Sentence

The defendant was the leader of an international neo-Nazi extremist group on whose behalf he repeatedly instructed others to commit violent hate crimes. The defendant praised successful attacks and provided his followers with operational support to carry out their own attacks, including by distributing detailed manuals on making explosives and lethal poisons, and by suggesting methods of execution and ways to avoid detection by law enforcement. He insisted that the attacks be recorded to prove they were executed and so that he could distribute them online to recruit others and encourage more attacks. And he penned a lengthy and detailed manifesto, the Hater's Handbook, which he distributed widely, and which encouraged others to commit acts of mass violence such as school shootings and described how to successfully do so. The defendant admitted during a *Mirandized* post-arrest interview that he meant for the Hater's Handbook to motivate others, and it plainly did.

Consistent with this modus operandi, the defendant planned and solicited, down to the very last detail, a mass casualty attack here in New York City targeting Jewish children and children in other minority communities. He repeatedly instructed and pressured UC-1 to move forward with the attack and provided resources to help him do that. He distributed detailed bomb-making instructions and poison-making instructions, as well as thorough plans for committing a successful attack without getting caught.[4] As he said himself, his goal was to "make sure many people [] die" and to execute a "bigger action than Breivik," the Norwegian neo-Nazi mass murderer.

The defendant bragged to others about violence he committed on behalf of MKY in order to convey the seriousness of his intentions and achieve real results. He said that he had murdered for the white race and bragged about harming a sick and elderly Jewish man in Brooklyn. He further stated that he wanted to obtain "unmarked guns" in the United States in order to commit additional violence here. He suggested that he had experience making and using Molotov cocktails and indicated that he was looking to obtain ricin poison. He also made specific threats of violence and death threats against individuals including his former romantic partner, Individual-1.

The defendant's repeated solicitations of violence had their intended effect. In addition to the violent attack videos described above (including the chemical attack on a homeless victim filmed at the defendant's request), the defendant's solicitations resulted in multiple

---

[4]     FBI personnel examined the instructions and confirmed that they could be used to make functioning explosives and poisons.

22

instances of real and attempted violence, including senseless killings in the United States and elsewhere.  Below are just some examples:

- In January 2025, a 17-year-old student at Antioch High School in Nashville, Tennessee entered his school's cafeteria and shot at his classmates with a semi-automatic handgun.  The attacker killed one student, injured another and terrorized untold others before committing suicide.  He livestreamed part of the attack on social media.  Prior to the attack, in an audio-recording posted online and attributed to him, the attacker claimed he was taking action on behalf of MKY and at least one other group.  The attacker's manifesto explicitly mentioned the defendant by name and included numerous references to MKY's founder, Yegor Krasnov.  The attacker stated that he would write Krasnov's name on his gun.  *See* PSR ¶ 27.

- In August 2024, an individual livestreamed himself stabbing approximately five people outside of a mosque in Eskisehir, Turkey, wearing a "siege mask," helmet, and tactical vest depicting a black sun and Totenkopf skull (white supremacist symbols linked to Nazi Germany).  A manifesto attributed to the attacker included explicit references to the defendant and to violent statements made by him.  Before the attack, the attacker also distributed a link to the Hater's Handbook, authored by the defendant as discussed above, and other violent propaganda.  Turkish media outlets reported that the attacker claimed he carried out the attack due to his "misanthropy," which is a term commonly used by MKY members and in MKY publications.  *Id.*

- In December 2025, a 20-year-old Florida resident was charged with possessing an illegal sawed-off shotgun and CSAM.  The individual, who was planning to carry out and broadcast a domestic terror attack, had distributed bomb-making instructions in a neo-Nazi group chat and posted about torturing non-white children.  He had previously distributed the Hater's Handbook, the defendant's MKY manifesto, and was also in possession of Nazi literature and the diaries of the Columbine High School shooters.  *See United States v. Temple*, No. 25-CR-581, ECF Nos. 5, 17 (M.D. Fla. 2025).

- In March 2026, a 16-year-old boy was charged in the United Kingdom for sending messages to members of a group he created on Telegram in which he encouraged the rape and self-harm of others.  The individual shared photos of himself dressed in neo-Nazi outfits and making a Nazi salute, and was alleged to have been inspired in part by MKY.  He possessed a copy of the Hater's Handbook.

- In November 2025, an 18-year-old high school student in Athens, Alabama, was arrested on terrorism and attempted murder charges in connection with an alleged plot to kill faculty and students at his school.  The individual was inspired by MKY, among other extremist groups.

MKY's incitements to violence were engrained in its mission from its inception, and early examples inspired the defendant to seek more.  In April 2022, for example, a 17-year-old German national living in Romania murdered a 74-year-old woman and recorded and

23

livestreamed himself brutally stabbing her and slitting her throat. He reportedly committed the murder as part of his initiation into MKY and claimed he killed the woman because she was Jewish; he later told investigators that he killed her because he thought she was Roma. In July 2022, the defendant sent the video of the murder to Welker, writing "This granny shit is so funny." Welker stated, "Finished the job Hitler couldn't." The defendant responded, "Finishing* // We just started." PSR ¶ 27.

The violence inspired by the defendant and MKY has had profound and lasting effects on communities. Survivors of the Antioch High School shooting have described the horrors of that day and how it forever changed their lives. Several statements written by them are attached hereto under seal as Exhibit B.

One teacher wrote:

That day, I watched as a student took his final breaths. My nightmares still remind me frequently: I cannot unsee his brain and blood splattering the walls, his eyes rolling back in his head. Next, come the looks of terror on the faces of children left alive yet scarred. Finally, I see her. She is wearing a small pink backpack that sits askew just enough to reveal a bullet hole through her chest. Blood is pooling around her, and I am helpless . . . .

Why? Because Michail Chkhikvishili wrote a "Hater's Handbook" and manipulated children to fulfill his murderous desires . . . . A year later, I am taking five different prescriptions to keep my anxiety in check and to ensure I get moments of sleep. But, this isn't just about me. It was reported that there were three victims, but there were over 2,500 people in the school building that day. Every one of them has a story, and every one of them is a victim . . . . This man [referring to Chkhikvishili] manipulated a vulnerable and impressionable boy and turned him into a self-hating murderer.

Exhibit B at 1.

A student wrote:

Before the shooting, school was a place where I felt safe. That sense of safety was taken from me and has not returned. I now live with constant fear and anxiety. Loud noises make me panic. I struggle to concentrate in class, to sleep at night, and to trust that public spaces are safe. I can't seem to trust all my classmates after this incident happened. I have cried several nights attempting to sleep traumatized by what other possible outcomes would have happened if I didn't react in time. I live in fear and highly aware of my surroundings every-time I walk anywhere crowded in school.

What happened was not random. The shooter was influenced and encouraged by the hate-filled ideology promoted by the defendant.

24

That ideology did not stay online or in words—it became violence that entered my school and permanently changed my life.

Exhibit B at 3.

And the mother of the murdered victim wrote:

I will always think of January 22, 2025, as the day that our lives changed. That morning, she left for her classes at Antioch High School in Nashville, TN, where she attended 10th grade. Like any other normal day, at lunch she went to the cafeteria to enjoy food and friends. No one saw it coming ... when one student entered and began shooting. My daughter had been hit, wounded and pronounced dead later at the hospital.

At that time, I was pregnant with my third child; the physical impact was so damaging that it took me to the Emergency at the hospital. I almost had a miscarriage, thanks God, we recovered and she is now five months old and yes, she is also a girl. My new girl.

The first year without her has been more than a nightmare for us; very emotional memories of her, we remember her dreams, aspirations, goals, that are gone with her now. I miss her laughter, her texts and calls. For the first year, we have spent the Holidays without her. Sadness, stress, anxiety, anger, insecurity are still hunting us.

The 1st Anniversary of her departure, January 2026 has been devastating for us as parents and for the family. We lost a precious angel as a daughter, a sister and a friend to many.

Exhibit B at 5.

Meanwhile, here in New York City, the defendant's thwarted plot to murder Jewish children and children in minority communities only added to the fear experienced every day by those communities in the wake of rising threats and violence. As the Executive Director of the Community Security Initiative, a program sponsored by Jewish groups, stated with respect to the thwarted plot:

[I]ts impact on New York's Jewish community was profound and deeply unsettling. The defendant's expressed intent to poison candy and target Jewish children crossed a critical threshold, transforming online extremist rhetoric into a credible and emotionally devastating threat.

In the current threat environment, Jewish communities are acutely aware that violence is often preceded by online radicalization and signaling. Threats directed at children, especially those invoking

25

communal or religious practices, strike at the most fundamental sense of safety for families and institutions. As a result, this case generated significant fear, anxiety, and heightened vigilance across synagogues, schools, and community organizations throughout New York.

For the community, this was not an abstract or speculative scenario. It reinforced the reality that extremist ideation—whether initially expressed online or not—can rapidly manifest into real-world harm. The disruption of this plot prevented potential tragedy, but it did not prevent the psychological impact. That harm was real, widespread, and enduring.

Exhibit B at 6.

The defendant's conduct was serious, persistent and intentional. It resulted in real-world violence including horrific killings, and it warrants a commensurate sentence.

B.      The Defendant's Personal History and Characteristics Do Not Warrant a Lesser Sentence

The defendant exhibited deeply violent and hateful behavior over the course of years. While he asserts that his indoctrination and radicalization began at age fifteen, when he was young and impressionable, the relevant conduct in this case occurred years later and into his early twenties. By his own admission, this radicalization was real and not just a façade constructed for online companionship: "Michail readily admits that he was genuinely a Nazi, that he hated Muslims and Jews . . . and that he wanted to bring about the destruction of Western civilization." Def. Mem. at 2.

He now insists, having been arrested and charged with serious federal crimes, that he has suddenly "matured" and "renounces Nazism, antisemitism, racism, and violence." Id. at 2, 12. The Court should view these assertions with great skepticism. As discussed above, the defendant's unhinged violent conduct was at a peak up to and until his arrest in July 2024. Just a few months before his arrest, asked if he felt guilt or regret for his violent conduct, he responded, "0." The reason he has not engaged in violent conduct since that time is that he has been incarcerated. And despite his claims that he began to disavow these beliefs while detained in Moldova pending extradition, in reality the defendant attempted during that time to recruit a corrections officer to MKY and indoctrinate him to its hateful ideologies. Subsequently, while detained at the Metropolitan Detention Center ("MDC") in Brooklyn, the defendant received a significant disciplinary infraction for possessing a mobile phone with Telegram installed on it (including 41 days loss of good conduct time, 30 days of disciplinary segregation and 180 days loss of visitation privileges). See PSR ¶ 60.[5] The defendant does not regret his actions; he simply regrets having been caught for them.

---

[5]      Thus, while the defendant seeks a downward variance as a result of alleged poor conditions during his confinement, the defendant only contributed to those conditions.

Indeed, the defendant's conduct was not an isolated incident or fleeting lapse in judgment. The defendant now asserts that he "wishes the Hater's Handbook would disappear," as if it were a single misguided internet post. Def. Mem. at 3. But that is not the case. The Hater's Handbook is a lengthy, detailed, meticulous manifesto promoting hatred and violence that the defendant drafted and updated with new editions multiple times over the course of years. He advertised new editions and distributed them broadly. This was not, as he suggests, a case in which an impressionable youngster was exposed to radical views online through YouTube algorithms. Def. Mem. at 2. In this case, the defendant was the one creating and distributing violent and hateful propaganda, and he shared it directly with Telegram users, Instagram users, and others, many of whom themselves were young and impressionable. He was the leader, not the follower. Nor was the defendant influenced to take these actions by his former romantic partner, *see* Def. Mem. at 9, Individual-1. The defendant wrote at least one edition of the Hater's Handbook manifesto in early 2021 long before his time with Individual-1 who, in any event, far from being an instigator, was the victim of his death threats charged in the indictment and described above. The defendant also distributed a document online in June 2024 "doxing" Individual-1 and her family and exposing several nude photographs of her.[6] He shared the document with UC-1 and discussed with UC-1 his interest in having someone harm Individual-1. Thus, the defendant's assertedly limited history of physical violence (including threatening his classmates, *see* Def. Mem. at 6, and participating in a physical assault of an Egyptian man, *see id.* at 6-7) misses the point entirely. Instructing his followers to commit specific acts of extreme violence against victims and to prove their completion by filming them is itself an incredible—albeit cowardly—act of violence on par with any physical acts the defendant may have himself taken. He did this over and over again, with real results.

The defendant cannot plausibly ask this Court to credit his myriad excuses while ignoring his repeated statements—made contemporaneously with his conduct, when he believed nobody was watching—evidencing the sincerity of his intentions. The defendant stated in the Hater's Handbook that he could "proudly say I've murdered for the white race," and addressed the manifesto to those who were "ready" to take "massive actions" by following its instructions. The defendant repeatedly disparaged those who failed to undertake real acts of violence—he said that MKY was the only group that had "done so many kills"; that, compared to other groups, "[w]e murder they larp" (*i.e.*, pretend); and that he did not "waste time" with "larpers" and "keyboard warrior kids." He described MKY as a "terrorist organization" that carried out "terror attack[s] and murders." And he told one prospective recruit, "[t]here's no room for you [in MKY] unless you have truly done something," meaning "spilling blood." Most tellingly, he stated that he would "murder more" but "*make others murder first*." That is precisely what he did: he got others to commit violence for him and for MKY, up to and including horrific murders. Thus, the defendant's assertion that his claims that he committed murders and beatings were "untrue," Def. Mem. at 2, again misses the point. The defendant was not charged with those crimes. He was charged with and pleaded guilty to soliciting those things from others, and his words and actions demonstrate he was serious about those solicitations. The defendant bragged about killing and beating others in order to normalize and lend credibility to his directives to others to do the same (he conceded as much to law enforcement). He supplemented those directives with specific,

---

[6]     Doxing refers to gathering an individual's personally identifiable information and releasing it publicly for malicious purposes, such as public humiliation, stalking, identity theft or targeting for harassment.

carefully conceived plans, and instructions on how to execute the attacks, film the attacks for MKY, and evade capture. This was how he "ma[d]e others murder" for him.

The Court should also reject the conclusions of the defendant's mental health expert Dr. Richard Loeb, who diagnoses the defendant with ███████████████████████ ████████████ and asserts that, while both conditions are now in remission, they nevertheless played a major role in the defendant's criminal conduct. In the first instance, Dr. Loeb's conclusions rely almost entirely on limited and uncorroborated self-reporting by the defendant. As the government's expert psychologist Dr. Barry Roenfeld observes, Dr. Loeb failed to conduct any "systematic assessment of the credibility of Mr. Chkhikvishvili's reported ███████ symptoms." Ex. C at 2 (Rosenfeld Report). ████████████████████████████████████ ████████████████████████████████████████████████████

████████████ Here, there was an escalated need for such an assessment. Not only does the defendant (by his own admission) have a history of lying to achieve desired outcomes, *see* Def. Mem. at 2, but his self-reporting paints a highly convenient picture. As Dr. Rosenfeld observes, "the apparent resolution of his ████████████ (without ███████ treatment), as well as his rapid retreat from beliefs he apparently maintained for 5-6 years, both of which seem to have resolved shortly after his arrest, raises questions about the genuineness of his self-report." Ex. C at 5-6.

Nor is Dr. Loeb's diagnosis sound even assuming the accuracy of the defendant's self-reporting. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

As Dr. Rosenfeld observes, Dr. Loeb ignored other likely explanations for the defendant's symptoms, ████████████████████████████████



*Id.* at 4-5.

 Dr. Loeb's diagnosis, even if accurate, hardly justifies the defendant's hateful and violent conduct over the course of years or mitigates his responsibility for his actions.

Nor should the Court credit the expert report of Jason Blazakis, an academic who teaches international studies and terrorism. First, the defendant declined to provide any notice of this expert to the government so that it could assess and properly rebut his clearly flawed methods and assumptions. Second, Professor Blazakis's focus is the online radicalization of impressionable individuals. But the defendant's radicalization years prior to his conduct is irrelevant. It is the *defendant's* attempts to radicalize *others*, and his simultaneous solicitations of others to commit violent crimes, that form the basis of his relevant conduct. Third, Professor Blazakis simply is not qualified to provide opinions to the Court that the defendant "expressed what I assessed to be genuine remorse" and similar assessments. Def. Mem. Ex. A at 8-9. Professor Blazakis is not a mental health professional, nor a social worker, nor the finder of fact in this sentencing proceeding. His report is in large part a regurgitation of the defendant's own assertions repackaged with the imprimatur of an academic who notably has never met the defendant in person and apparently spoke with him just once via videoconference. The Court should disregard the report.

C.    The Need for Deterrence and Just Punishment for the Offense

There is a strong need for both specific and general deterrence in this case. As to specific deterrence, as outlined above, the offense conduct involved serious violence born of deep-seated ideological belief and radicalization. The defendant made violent solicitations over and over to anyone who would listen. A significant sentence of incarceration is needed to ensure that the defendant will not continue to work with members of MKY to commit acts of hateful violence.

General deterrence is just as important in this case. The defendant's sentence must send a strong message that hateful violent conduct like the defendant's will not go unpunished—including, and particularly, the solicitation of violent acts from others. It must make clear that extremists who operate online and hide behind a computer screen to organize violence are not immune from the real-world consequences of their actions. And it must demonstrate to the defendant's many followers that their continued support of the defendant's and MKY's calls to violence will be seriously punished.

Indeed, the defendant's MKY followers have remained steadfast.  For example, following the defendant's arrest and extradition, law enforcement received a bomb threat to a New York City landmark from individuals claiming to be members of MKY and seeking to "avenge" the defendant's arrest (the threat was not carried out).  The threat stated, among other things:

> We are from the terrorist group MKY and we have installed a bomb . . . to destroy the center of American capitalism and international jewry and cause as much economic damage as possible taking as many lives as we can at the same time . . . .  We will show you all what an actual attack done by true maniacs looks like.  Today the world will see what our group is capable of, we will avenge our leader Commander Butcher who was caught by the FBI.  Today will be an historic day of absolute glory.  AMERICA WILL FALL! LONG LIVE THE MKY!

Also following the defendant's arrest, a Telegram channel associated with MKY released a short video honoring prominent MKY members who had been detained, including the defendant, with the message, "we don't give up.  We are back again, back in action."  MKY members around the world rallied behind the cause, as illustrated in the below image of graffiti in one European city supporting MKY and the defendant following his arrest.



As Judge Chen observed when she sentenced Welker to an above-Guidelines term of imprisonment:

> I agree with the Government that extremist groups will pay attention to this sentence because they obviously would prefer to operate with impunity and avoid any repercussions under the law.  They should understand anyone who is considering any kind of threat-related

> conduct like this that there will be serious consequences; that these individuals will face prosecution and real prison time.  This defendant and his followers and associates must understand that they will not be allowed to terrorize others with impunity.

April 19, 2024 Sentencing Tr. at 53.  But Welker did not inspire the level of real-world death and violence wrought by the defendant, who aptly went by the moniker "Butcher."

For these reasons, similarly situated defendants have received significant sentences for soliciting, encouraging and enabling hate-motivated violence.  In December 2025, Dallas Humber, the leader of the transnational white supremacist extremist group Terrorgram Collective, was sentenced to 30 years' imprisonment for soliciting hate crimes, among other offenses.[7]  Just as here, Humber and other members of the Terrorgram Collective solicited individuals to commit hate crimes, terrorist attacks and murders.  Just as here, they provided technical, inspirational and operational guidance to equip those individuals to plan, prepare for and successfully carry out those attacks.  Just as here, as a result, violent attacks were both planned and carried out.  *See United States v. Humber*, 24-CR-257 (E.D. Cal.).

According to data from the United States Sentencing Commission, in fiscal year 2025 approximately 14 defendants in Criminal History Category I were sentenced under U.S.S.G. § 2A1.5 (conspiracy or solicitation to commit murder), as here.  Half of them were sentenced to ten or more years of imprisonment.  *See* United States Sentencing Commission: Interactive Data Analyzer, available at https://ida.ussc.gov/ (last accessed April 27, 2026).  However, defendants convicted of similar conduct (such as inciting terrorist attacks via social media and leading a white supremacist extremist group) have received much higher sentences, ranging from 30 to 40 years imprisonment.  *See, e.g.*, *United States v. Saleh*, No. 15-CR-517 (WFK), 2021 WL 5544957 (E.D.N.Y. 2021) (defendant sentenced to 30 years in prison for providing material support to ISIS by, among other things, using Telegram and other social media to spread ISIS propaganda, promote jihad, and guide others to commit terrorist attacks); *United States v. Rahim*, 860 Fed. App'x 47 (5th Cir. 2021) (defendant sentenced to 30 years in prison for providing material support to ISIS by administering and moderating a social media channel designed to encourage people to join ISIS and to incite people to commit terrorist attacks in ISIS's name); *United States v. Hale*, 448 F.3d 971, 989 (7th Cir. 2006) (defendant sentenced to 40 years in prison for crimes he committed as the leader of a white supremacist group, including inciting a follower to commit a mass-shooting and soliciting the murder of a federal judge).

Crucially, the defendant's advisory Guidelines range does not even take into consideration much of the defendant's overseas conduct that was not charged here.  For example, the defendant's possession of CSAM on its own would give rise to a significant advisory sentencing range and likely a mandatory minimum sentence of five years since it was knowingly received.  *See* 18 U.S.C. § 2252(a)(2).  The defendant's distribution of animal abuse videos would give rise to additional sentencing exposure, *see* 18 U.S.C. § 48, as would his nonconsensual

---

[7]   Humber entered into a plea agreement with the government pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) in which the parties agreed to a sentencing range of 25 to 30 years, which was significantly below Humber's advisory Guidelines range.

distribution of intimate images of Individual-1, *see* 47 U.S.C. § 223(h)(2)(A). This unaccounted for conduct, on top of the already egregious charged conduct, makes a high guidelines sentence all the more appropriate. And most notably, the government has not sought to augment the Guidelines by holding the defendant to account for the real-world murders that he inspired through his years-long concerted efforts to solicit violence and mass-casualty actions. At great effort, the defendant successfully caused others to ruin or end their own lives and those of thousands of others. The violence perpetrated by those he deliberately and purposefully inspired is the defendant's mark on the world. His decision to entice others to commit mass murder requires a substantial punishment.

V.      Conclusion

This is not an ordinary case of threats or solicitation. More and more, violence in our communities begins online with hateful calls to action that are taken to heart and executed by others. The defendant made such calls, intending that they be acted on, time and again over the course of years. And the defendant accomplished what he set out to do. His Hater's Handbook manifesto has been read and used by others to engage in and justify unfathomable acts of murder and other violence. The Court should send a strong message to extremists and would-be perpetrators of hate-fueled violence that this type of conduct will not be tolerated.

For these reasons, the government respectfully requests that the Court impose a sentence of 210 months' imprisonment.

Respectfully submitted,

JOESEPH NOCELLA, JR.
United States Attorney

By:     /s/
        Andrew D. Reich
        Ellen H. Sise
        Assistant U.S. Attorneys
        (718) 254-7000

cc:     Clerk of the Court (CBA) (by ECF and E-mail)
        Defense Counsel (by ECF and E-mail)

32